**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FALLON COMMUNITY HEALTH PLAN, INC., | |
| *Plaintiff,* | |
| v. | CASE NO.: _____ |
| INNOVACCER, INC., | |
| *Defendant.* | |

## COMPLAINT AND JURY TRIAL DEMAND

This case involves material representations of Innovaccer, Inc. ("Innovaccer") to induce Fallon Community Health Plan, Inc. ("Fallon") to enter into software contracts with Innovaccer. Innovaccer was not capable of fulfilling the representations upon which Fallon relied when entering into the contracts. Innovaccer's assertions otherwise constituted fraudulent and material misrepresentations. Fallon has suffered damages in the fees paid to Innovaccer and in the time and expenses that Fallon has incurred to assist Innovaccer in attempting to cure its repeated breaches of contracts, as well as the time and effort Fallon expended trying to get the software to work. Fallon fully performed under the parties' agreements and seeks more than $600,000 in damages due to Innovaccer's bad faith breaches, trebled, together with interest and attorney's fees and costs.

## PARTIES

1.      Fallon is a health insurance and health care services provider. Fallon is a non-profit corporation, organized under the laws of the Commonwealth of Massachusetts, with its headquarters located at 1 Mercantile Street, Suite 400, in Worcester, Worcester County,

Massachusetts. For nearly fifty (50) years, Fallon has been committed to its mission of improving health and inspiring hope in the communities it serves.

2.      Innovaccer is digital healthcare company, organized under the laws of Delaware, with its principal place of business located at 101 Mission Street, Suite 1950, in San Francisco, San Francisco County, California.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because this is a civil action between a citizen of Massachusetts, on the one hand and a citizen of a foreign state, on the other, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

4.      Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Fallon's claims against Innovaccer occurred Worcester County in the District of Massachusetts. Innovaccer contracted to provide services to Fallon in Massachusetts, subjecting Innovaccer to jurisdiction and venue in Massachusetts.

## STATEMENT OF FACTS

### Representations by Innovaccer to Fallon and Contracts

5.      Innovaccer represented that it could provide a digital technology solution to Fallon's operations by unifying patient records into a "Care as One" framework.

6.      Through this unified system, Innovaccer claimed that the "full potential" of Fallon could be captured through identifying and closing coding gaps, streamlining care, improving provider utilization, and more efficient reporting, among other things.

7.      Relying upon those representations, Fallon entered into a Master Service Agreement and a Service Order on January 3, 2022.  A true and correct copy of the Master Service

Agreement ("MSA") and the Service Order are attached hereto and marked as Exhibits "A" and "B," respectively.

8.      The MSA and the Service Order required Innovaccer to provide three principal deliverables that would allegedly accomplish the system improvements Innovaccer had promised to Fallon.

9.      Pursuant to the Statement of Work attached to the Service Order, the three deliverables that Innovaccer promised included: (a.) creation of a Data Activation Platform ("DAP") using data from Fallon's vendors and providers; (b.) incorporation of InNote PACE Pilot; and (c.) development of a Web-Based Risk Adjustment Dashboard. *See* Ex. 1 to Ex B.

10.     Innovaccer represented that once these deliverables were integrated into Fallon's network, they would allegedly improve revenue, decrease manual processes, and increase Fallon's overall efficiency.

11.     Innovaccer represented that similar measures had already helped to improve dozens of healthcare networks, some much larger than Fallon.

**Innovaccer's Inability to Perform and Breaches**

12.     Innovaccer was wholly incapable of delivering upon its representations.

13.     After months of ramp-up and data-sharing, the Innovaccer software never made it out of the testing phase and the software never performed as represented by Innovaccer.

14.     Innovaccer's inability to process the number of Fallon providers delayed the DAP deployment.

15.     The DAP also failed to include Medicaid data analytics even after many months.

16.     The InNote PACE Pilot required Care Teams to login to Innovaccer's system, separately from Fallon's system, directly contradicting Innovaccer's promises that InNote allowed Care Team collaboration "without leaving their workflows."

17.     The InNote tool could not be delivered to the PACE providers due to numerous data inaccuracies.

18.     The Web-Based Risk Adjustment Dashboard did not fulfill its primary purpose of identifying "practices and providers having the best and worst risk recapture rates," defeating the very purpose of the "risk adjustment" tool.

19.     Most important and concerning was that Innovaccer's software was plagued by data inconsistencies.

20.     On numerous occasions, Fallon encountered Innovaccer analytics that were provably false, which was completely unacceptable with patient data.

**Fallon's Notice of Material Breach and Innovaccer's Failure to Cure**

21.     On June 2, 2023, Fallon served a Notice of Material Breach upon Innovaccer, specifically outlining Innovaccer's many breaches of the MSA and the Service Order.  A true and correct copy of the Notice of Material Breach is attached hereto and marked as Exhibit "C."

22.     Fallon allowed a 30-day period for Innovaccer to cure the deficiencies.

23.     Instead of fixing the multitude of problems Innovaccer had created, Innovaccer made more representations about its products' capabilities via a slideshow while simultaneously promising to address Fallon's concerns.

24.     Innovaccer's "corrections" were mostly cosmetic.  By making superficial adjustments without solving the underlying data inconsistencies, Innovaccer treated the symptoms, but not the disease.

25.     The continued existence of any patient data inconsistencies made reliance upon Innovaccer's product impossible.

26.     Instead of fixing the root problems, Innovaccer callously dismissed Fallon's concerns.

27.     As a result of Innovaccer's failure to cure, Fallon issued a Notice of Termination on September 8, 2023.  A true and correct copy of the Notice of Termination is attached hereto and marked as Exhibit "D."

28.     Fallon was forced to cease the test phase of Innovaccer's software gaining no benefit from it, despite the considerable time and cost Fallon had invested.

29.     Innovaccer was both unable and unwilling to perform upon its contractual representations to Fallon.

30.     Fallon paid Innovaccer over $550,000 for a product that provided no benefit to Fallon.

31.     Additionally, Fallon has incurred significant time and expense as follows: the considerable time and expense Fallon employees and providers attempted in vain to use the Innovaccer software; the lost revenue from the promised gap closures that were not delivered; and attorney's fees for evaluating and responding to Innovaccer's spurious demands.

## CAUSES OF ACTION

## COUNT ONE

### Fraud in the Inducement

32.     Fallon incorporates the averments of Paragraph Nos. 1-31 by reference as though fully set forth herein.

33.    Innovaccer misrepresented the capabilities of its software and prior use of the software with health plans such as Fallon.

34.    Innovaccer misrepresented that its software had certain performance capabilities and was suitable for Fallon's requirements, which it was not.

35.    Innovaccer knew those misrepresentations were untrue or made the misrepresentations with reckless disregard for their veracity.

36.    Innovaccer's misrepresentations were material.

37.    Innovaccer's misrepresentations were made with the purpose of inducing Fallon to enter into the MSA and the Service Order.

38.    Fallon was reasonable and justified in relying upon Innovaccer's representations.

39.    Fallon was damaged by Innovaccer's misrepresentations with Fallon performing its obligation under the parties' agreements, and Innovaccer breaching its obligations and failing to provide Fallon with the benefit of the software and service that Innovaccer had promised to provide.

## COUNT TWO

### Breach of Contract

40.    Fallon incorporates the averments of Paragraph Nos. 1-39 by reference as though fully set forth herein.

41.    The MSA and the Service Order, when entered into, were binding contracts supported by consideration.

42.    Fallon performed all of its obligations under the MSA and the Service Order.

43.     Innovaccer materially breached the MSA and Service Order by failing to perform as required under the agreements including failing to deliver the promised software and services that Innovaccer represented that it would provide.

44.     Innovaccer's conduct severely damaged Fallon as outlined above.

## COUNT THREE

### Violation of Mass. Gen. L. ch. 93A, § 11

45.     Fallon incorporates the averments of Paragraph Nos. 1-44 by reference as though fully set forth herein.

46.     At all times material hereto, Fallon and Innovaccer were engaged in trade or commerce in the Commonwealth of Massachusetts.

47.     The acts of Innovaccer giving rise to Fallon's claims occurred primarily and substantially in Massachusetts, where Fallon is located and where Innovaccer was to deliver its software and services.

48.     The acts of Innovaccer constitute unfair and deceptive acts and practices in violation of Mass. Gen. L. ch. 93A, § 11.

49.     Innovaccer's unfair and deceptive acts and practices were willful and knowing.

50.     Innovaccer's unfair and deceptive acts and practices caused Fallon substantial damages.

51.     Pursuant to Mass. Gen. L. ch. 93A, Fallon is entitled to recover up to treble its damages, together with interest, costs and attorney's fees.

## COUNT FOUR

### Unjust Enrichment

52.    Fallon incorporates the averments of Paragraph Nos. 1-51 by reference as though fully set forth herein.

53.    Fallon paid Innovaccer fees that Innovaccer charged allegedly under the MSA and the Service Order.

54.    Innovaccer had knowledge of the benefit conferred upon it by Fallon's payment of fees that Innovaccer charged to Fallon allegedly under the MSA and the Service Order.

55.    Innovaccer has completely failed to provide the software and services promised and required under the MSA and the Service Order.

56.    Innovaccer has been unjustly enriched, being paid for services and software which it never provided.

57.    Permitting Innovaccer to retain the fees paid by Fallon would be inequitable and result in unjust enrichment to Innovaccer to the detriment of Fallon, and would violate the fundamental principles of justice, equity and good conscience.

## COUNT FIVE

### Breach of the Covenant of Good Faith and Fair Dealing

58.    Fallon incorporates the averments of Paragraph Nos. 1-57 by reference as though fully set forth herein.

59.    The MSA and the Service Order included the implied promise by both Fallon and Innovaccer to deal with each other fairly and in good faith.

60.    Innovaccer breached its covenant of good faith and fair dealing as more fully described above, including but not limited to failing to deliver the software and services promised,

and by failing to represent accurately the capability of Innovaccer's software and its suitability to Fallon's needs.

61.     As a direct and proximate result of Innovaccer's conduct and breach of the covenant of good faith and fair dealing, Fallon has sustained significant damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Fallon Community Health Plan, Inc. respectfully requests the award of the following relief:

1.     Enter judgment in favor of Fallon Community Health Plan, Inc. and against Innovaccer Inc. on each Count of the Complaint in an amount to be determined at trial;

2.     Award Fallon Community Health Plan, Inc. interest upon the judgment;

3.     Award Fallon Community Health Plan, Inc. its costs and attorney's fees;

4.     Award Fallon Community Health Plan, Inc. up to treble its damages caused by Innovaccer, Inc.'s unfair and deceptive practices; and

5.     Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b)(1), Fallon Community Health Plan, Inc.

demands a trial by jury on all issues so triable.

Respectfully submitted,

FALLON COMMUNITY HEALTH PLAN, INC.,

By its attorneys,

 /s/ Pamela E. Berman
Pamela E. Berman (BBO No. 551806)
Christopher P. Fitzgerald (BBO No. 685408)
CONN KAVANAUGH ROSENTHAL PEISCH
& FORD LLP
One Federal Street, 15th Floor
Boston, Massachusetts  02110
pberman@connkavanaugh.com
cfitzgerald@connkavanaugh.com
Tel.: 617-482-8200
Fax:  617-482-6444

Dated:  December 10, 2025

# EXHIBIT A

**♠ innovaccer**

### INNOVACCER MASTER SOFTWARE AS A SERVICE AGREEMENT (FULL FORM)

This MASTER SOFTWARE AS A SERVICE AGREEMENT is entered into as of January 1, 2022 (the "**Effective Date**"), by and between and Innovaccer Inc., a Delaware corporation having its principal place of business at 535 Mission St, 14th floor, San Francisco, CA, 94105, USA ("**Company**"), and Fallon Community Health Plan, Inc. having its principal place of business at 10 Chestnut St., Worcester, MA 01608 (the "**Customer**"). The Company and the Customer are hereinafter sometimes referred to as the "**Parties**" and individually as a "**Party**."

1. **Definitions.**  Capitalized terms not otherwise defined in this agreement shall have the meanings ascribed to them below.

    1.1    "**Agreement**" means this Master Software as a Service Agreement and the applicable Service Order, together.

    1.2    "**Company Materials**" means the Software, Third Party Materials, related specifications and documentation, Company's Confidential Information, and any and all other proprietary documents, materials, devices, methods, processes, hardware, software and other technologies and inventions, technical or functional descriptions, requirements, plans or reports of Company, created, developed or authored by Company or its licensees, that are provided to Customer or Users in connection with the Software or the Services. Company Materials also include the information technology infrastructure used by or on behalf of Company in performing the Services or providing the Software, including all computers, software, hardware, databases, electronic systems and networks, whether operated directly by Company or through the use of third-party services.

    1.3    "**Confidential Information**" has the meaning provided in Section 8.

    1.4    "**Customer Systems**" means Customer's or any third-party information technology infrastructure, including computers, software, hardware, databases, electronic systems (including database management systems, EMR/EHR etc.) and networks, whether operated directly by the Customer or by a third party.

    1.5    "**Data**" means any data or information input and/or stored in the Software by Users or any data provided by Customer to be processed by Company through the Software.

    1.6    "**Representatives**" means a Party's and its affiliates' employees, officers, directors, contractors and agents.

    1.7    "**Services**" means any services specified to be provided by Company to Customer under the applicable Service Order, including maintenance, training, configuration, data extraction, data feed integration, support and hosting.

    1.8    "**Service Order**" means a document referencing this Master Software as a Service Agreement signed by both Parties which specifies the Software and Services to be provided by Company, identifies the responsibilities of the Parties, specifies the term (for which the Parties' rights and obligations shall be in force) and specifies fees and expenses to be paid by Customer. A Service Order may also include additional terms with respect to the Software and Services. Any project charter, project pan or other scope document prepared by either Party and mutually agreed by both Parties in writing shall also be considered a part of the Service Order.

    1.9    "**Software**" means Company's proprietary software, platform, portal, dashboard or applications (including web app, desktop app and mobile app) and any computer program or module related thereto, including all documentation, new versions, updates, enhancements, customizations, upgrades, revisions, improvements and modifications of the foregoing that Company provides to Customer under a Service Order– whether the foregoing is developed, created, originated before or after the Effective Date (including developments and creations made under the Agreement).

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

*innovaccer*

1.10    **"Term"** has the meaning given in Section 7.

1.11    **"Third Party Materials"** means materials and information, in any form or medium, including any open-source or other software, documents, data, content, specifications, products, equipment or components of or relating to the Software that are not proprietary to Company.

1.12    "**Users**" means all users of the Software and Services, including but not limited to individuals who access and use the Software from any public platform or website as agreed by the Parties hereunder.  User shall not include any third parties without prior written approval of Company.

2.  **Access to Software and Services.**

2.1.    <u>Service Orders</u>. Company shall provide Customer access to the Software, Third Party Materials and the Services as described in one or more Service Orders in accordance with the terms and timeframes set forth therein. Each Service Order executed shall constitute a separate agreement that shall be subject to the terms and conditions of this Master Software as a Service Agreement and shall be binding only when duly executed by both Parties. To the extent any provision in a Service Order conflicts with any provision in this Master Software as a Service Agreement, the provision in the Service Order will control.

2.2.    <u>Access to Software</u>. Subject to and conditioned on Customer's compliance with the terms and conditions of the Agreement and the Service Order, Company shall grant to Customer, a limited, non-exclusive, non-transferable, non-sublicensable, non-assignable right to access and use the Software specified in the applicable Service Order solely for its internal business purposes as may be further described in the Service Order. Customer may exercise this right only during the Term and only within the United States of America in accordance with specification for the Software provided to Customer.  The Software shall be available as per the service level agreements as provided in Exhibit A below. Company shall provide support Services as specified in Exhibit A.

Customer's access to the Software will be enabled upon completion of the implementation work as specified in the Service Order or otherwise agreed between the parties in writing.  Customer's right to access the Software shall cease immediately upon the expiration or termination of the applicable Service Order.

Any User provided access to the Software by Customer may have to accept the terms of use/service for such Software displayed at the time of using, accessing or downloading the Software and the Privacy Policy of Company referenced in such terms (together, "User Terms").

2.3.    <u>Security</u>. Company will employ security measures in accordance with applicable industry practice to protect Data from unauthorized use or disclosure. Customer agrees that, unless otherwise agreed in a Service Order, Company will be hosting Data on servers in the United States provided by Company's hosting/cloud services provider; provided however that Company may access, use and process Data from outside the United States through a secure VPN/Citrix connection.

2.4.    <u>Company Rights</u>.

(i) Company reserves the right, in its sole discretion, to make any changes to the Software and Company Materials that it deems necessary or useful to: (a) maintain or enhance (i) the quality or delivery of Company's

2

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

**☀ innovaccer**

services to its customers, (ii) the competitive strength of or market for Software and Company's services or (iii) the Software's cost efficiency or performance or (b) to comply with applicable law.

(ii) Company has and will retain sole control over the operation, provision, maintenance and management of the Software, Services and Company Materials, including the: (a) location(s) where any of the Services are performed; (b) selection, deployment, modification and replacement of the Software; and (d) performance of support Services and Service maintenance, upgrades, updates, corrections and repairs.

(iii) Company will have the right to review and monitor all use of the Company Materials by Customer and its Users to ensure compliance with all of the terms of the documentation provided by Company and this Agreement.

(iv) Company may monitor and use for its internal purposes any information relating to Customer's and Users' usage of the Software and Services, for example, number of Users, usage levels, nature and type of application usage, transactions processed, configurations, and reports processed using the Software and Services (hereinafter, "Analytics").

2.5.    <u>Authorization Limitations and Restrictions</u>. Customer's and Users' access to and use of the Software and any Company Materials is subject to the restrictions in this Section 2.5.  Customer or its Users shall not, except as the Agreement expressly permits: (i) copy, modify or create derivative works or improvements of the Software or Company Materials, or rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer or otherwise make available any Software or Company Materials to any third party; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer or otherwise make available any Software or Company Materials to any third party, including on or in connection with the internet or any time-sharing, service bureau, software as a service, cloud or other technology or service; (iii) reverse-engineer, disassemble, decompile, decode, adapt or otherwise attempt to derive or gain access to the source code of the Software or Company Materials; (iv) input, upload, transmit or otherwise provide to or through the Software or Company Materials, any information or materials that is: (1) unlawful or injurious, libelous, threatening, obscene or would violate the copyright or other intellectual property right or privacy right of any person, or (2) contain, transmit or activate any virus, worm, malware or other malicious computer code; or (v) access or use the Software or Company Materials in any manner or for any purpose that is not expressly specified hereunder or that violates any applicable law; (v) bypass or breach any security device or protection used by the Software or Company Materials or access or use the Software or Company Materials other than by an User through the use of his or her own then valid access credentials; (vi) damage, destroy, disrupt, disable, impair, interfere with or otherwise impede or harm in any manner the Software or Company Materials or Company's provision of services to any third party; (vii) remove, delete, alter or obscure any trademarks, specifications, documentation, warranties or disclaimers, or any copyright, trademark, patent or other intellectual property or proprietary rights notices from any  Company Materials, including any copy thereof; or (viii) access or use the Software or Company Materials for purposes of competitive analysis of the Software or Company Materials, the development, provision or use of a competing software service or product or any other purpose that is to the Company's detriment or commercial disadvantage. Customer acknowledges that a violation of this <u>Section 2.5</u> shall be deemed a material breach of the Agreement.

2.6.    <u>Acceptance</u>. Company will notify Customer when it believes it has completed a milestone or a deliverable as may be specified in the applicable Service Order. Customer will have 15 days to evaluate whether

3

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1



the milestone or deliverable is complete according to the acceptance/sign-off criteria defined in the applicable Service Order. If Customer believes that a milestone or deliverable is not complete according to the applicable acceptance/sign-off criteria, Customer will promptly provide a written notice of rejection to Company specifying in reasonable detail the basis for Customer's rejection. In the event Customer has not provided a written notice of rejection within 15 days after Company's notification of completion of a milestone or deliverable, the milestone or deliverable shall be deemed accepted. Upon receipt of a written notice of rejection, Company shall make up to but not more than three commercially reasonable efforts to complete the milestone or deliverable within 30 days to meet the acceptance/sign-off criteria, and the completion of the milestone or deliverable will again be subject to the acceptance procedure described above. If even after three attempts, Company fails to meet the acceptance/sign-off criteria for a milestone or deliverable as specified in an applicable Service Order, Customer reserves the right to terminate per Section 7.2 (a) of this Agreement.

3. **Customer Obligations**.

    3.1.    <u>Customer Responsibilities</u>. Customer shall at all times: (a) be responsible for the acts or omissions of Users; (b) be responsible for granting Company the access to the Data and Customer Systems and all information, instructions and materials as required for Company to perform its obligations under the Agreement; (c) provide Company personnel with timely access to Customer's premises as may be reasonably necessary for Company to perform the Services in accordance with the terms of the Agreement and (d) provide all cooperation and assistance as Company may reasonably request to enable Company to exercise its rights and perform its obligations hereunder.

Customer shall employ all physical, administrative and technical controls, screening and security procedures and other safeguards necessary to securely administer the distribution and use of all access credentials generated by Company to access the Software and protect against any unauthorized access to or use of the Data or Company Materials. Customer shall have the sole responsibility for all access to and use of the Software and Company Materials directly or indirectly by or through the Customer Systems or its Users' access credentials, with or without Customer's knowledge or consent, including all results obtained from, and all conclusions, decisions and actions based on, such access or use.

If Customer becomes aware of any actual or threatened prohibited activity by Customer or any User, Customer shall, and shall cause its Users to, immediately: (a) take all reasonable and lawful measures that are necessary to stop the activity or threatened activity and to mitigate its effects (including, where applicable, by discontinuing and preventing any access to the Software and Company Materials); and (b) notify Company of any such actual or threatened activity.

    3.2.    <u>Customer Failure or Delay</u>. Company is not responsible or liable for any delay or failure of performance caused in whole or in part by Customer's delay in performing, or failure to perform, any of its obligations under the Agreement. Company' adherence to any timelines and milestones specified in the Service Order shall depend on Customer's timely provision of all Data (in the format agreed between the Parties) and other information and materials required by Company.

    3.3.    <u>Non-Solicitation</u>. During the Term and for 1 year after, neither Party shall directly or indirectly recruit or solicit for employment or engagement as an independent contractor any person then or within the prior 6 months employed or engaged by the other Party or any subcontractor and involved in any respect with the

4

**☀ innovaccer**

Software or Services or the performance of this Agreement (other than by general advertisement not directed specifically to such individuals). In the event of a violation of this Section 3.3, a Party will be entitled to liquidated damages equal to the compensation paid by violating Party to the applicable employee or contractor during the prior 12 months.

4. **Fees**.

    4.1.    Fees. Customer shall pay Company the fees in the amount set forth in the applicable Service Order in accordance with the terms set forth in this Section 4 and as may be specified in the Service Order.

    4.2.    Taxes. Customer Customer is recognized by the Internal Revenue Service as a 501 (c) (3) not-for-profit entity and as such is exempt from sales/use taxes.  Customer shall furnish Company proof of such status.

    4.3.    Payment Terms.  Unless otherwise agreed in the Service Order, Customer shall pay all Fees and any reimbursable expenses, which are not disputed by Customer in good faith, within 30 days after the date of the invoice therefor. Customer shall make all payments hereunder in US dollars by wire transfer or check. Customer shall make payments to the address or account as the Parties agree to and may specify in writing from time to time. In the event of an invoice dispute, the Customer shall provide Company written notice of any disputed amounts (in accordance with the notice provisions herein) within thirty (30) days, that shall include a reasonable explanation to support the withholding of any disputed amounts. The Parties shall seek to resolve all such disputes expeditiously and in good faith. Company shall have no obligation to continue to perform its obligations in accordance with this Agreement during the pendency of any dispute.

    4.4.    Late Payment. If Customer fails to make any payment of amounts not disputed in good faith when due then, in addition to all other remedies that may be available, Company may charge interest on the past due undisputed amount at the rate of 1 % per month. Customer shall reimburse Company for all reasonable costs incurred by Company in collecting any late payments or interest, including attorneys' fees, court costs and collection agency fees; and if such failure to pay continues for thirty days following written notice thereof, Company may suspend access to the Software and Company Materials and performance of its obligations under the Agreement until all undisputed past due amounts have been paid, without incurring any obligation or liability to Customer or any other person by reason of such suspension.

    4.5.    No Deductions or Setoffs. All amounts payable to Company under this Agreement shall be paid by Customer to Company in full without any setoff, recoupment, counterclaim, deduction, debit or withholding for any reason or deduction or withholding of tax as may be required by applicable law, with the exception of disputed amounts.

5. **Intellectual Property Rights.**

    5.1.    Company Materials. All right, title and interest in and to the Software, deliverables (if any) and Company Materials, Analytics, any changes, corrections, bug fixes, enhancements, customizations, updates and other modifications thereto including all intellectual property rights therein, are and will remain with Company and its respective licensors. Customer has no right, license or authorization with respect to any of the Software or Company Materials except as expressly set forth in Section 2.

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

**≁ innovaccer**

Customer hereby unconditionally and irrevocably grants to Company an unrestricted license to use any feedback or suggestions (excluding any Data included therein) given to Company, or other ideas for enhancement and recommendations provided by Customer to Company, including all intellectual property rights relating thereto.

5.2.    Customer Materials. As between Customer and Company, Customer is and will remain the sole and exclusive owner of all right, title and interest in and to all Data and Customer Systems, including all intellectual property rights relating thereto, subject to the rights and permissions granted to Company hereunder. Subject to the terms and conditions of the Agreement, the Customer hereby grants Company a limited, non-transferable, non-exclusive, royalty-free license during the Term to use, reproduce, electronically distribute, transmit, have transmitted, perform, display, store, archive, and make derivative works of the Data and Customer Systems solely in order to provide the Software and the Services to Customer.

5.3.    Works for Hire. Company shall retain all right, title interest in any deliverables or work product created or developed under the Agreement at all times and no deliverable or work product shall be deemed a "work made for hire" as such term is defined under Section 101 of the U.S. Copyright Act. If for any reason the deliverables or work product are determined to be a "work made for hire" under U.S. law or the law of any other jurisdiction, or to the extent any right or title is retained by Customer regarding deliverables or work product, Customer hereby irrevocably assigns to Company all of Customer's right, title and interest in and to all copyrights in the deliverables and work product. Customer shall also execute any instruments necessary to complete the transfer to Company of such ownership and title.

5.4.    Limited Trademark License; Marketing Materials. Customer hereby grants Company a royalty-free, non-exclusive, non-transferable, limited term license to use Customer's Marks (i.e., corporate or trade name, trademark(s), logo(s), domain names or other identification of Customer) for the purpose of aligning the appearance of the Software to Customer's branding only as specifically authorized by, and subject to any restrictions stated in, this Agreement. Company may include Customer's name and Marks in any of Company's customer lists, testimonials and Customer pre-approved press releases, including in its website, for the purpose of identifying Customer as a customer of Company and for other business promotional purposes.

## 6. **Warranties**

6.1.    Company Warranty. Company warrants to Customer that during the Term, (a) the Software and the Services will perform substantially in accordance with the terms of documentation provided by Company, (b) Company has the right to grant the license granted under this Agreement, and (c) Company has the necessary resources, expertise, and personnel to perform the Services in a professional manner according to the terms and conditions of this Agreement and the Service Order. The foregoing warranty in clause (a) shall not apply to performance issues (i) caused solely by factors outside of Company's reasonable control; (ii) that result solely from any improper actions or inactions of Customer, its Users, or any third parties; or (iii) that result solely from Customer's data structure, operating environment or equipment.

6.2.    Customer Warranty. Customer represents, warrants and covenants to Company that Customer owns or otherwise has and will have the necessary rights and consents in and relating to the Data and Customer Systems so that, as received by Company and used in accordance with the Agreement, they do not and will not,

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

*innovaccer*

in Customer's knowledge after reasonable inquiry, infringe, misappropriate or otherwise violate any intellectual property rights, or any privacy or other rights of any third party or violate any applicable law.

6.3.    Disclaimer of Any Other Warranties. EXCEPT FOR THE EXPRESS WARRANTIES PROVIDED IN SECTION 6.1, ALL SOFTWARE, SERVICES AND COMPANY MATERIALS ARE PROVIDED "AS IS" AND COMPANY HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHER. COMPANY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE OR TRADE PRACTICE. WITHOUT LIMITING THE FOREGOING, COMPANY MAKES NO WARRANTY OF ANY KIND THAT THE SOFTWARE OR COMPANY MATERIALS OR RESULTS OF THE USE THEREOF, WILL MEET CUSTOMER'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES EXCEPT IF AND TO THE EXTENT EXPRESSLY SET FORTH IN THE SPECIFICATIONS, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE OR ERROR FREE.

ALL THIRD-PARTY MATERIALS ARE PROVIDED "AS IS" AND COMPANY DOES NOT MAKE ANY REPRESENTATION OR PROVIDE ANY WARRANTY REGARDING ANY THIRD-PARTY MATERIALS, PROVIDED THAT COMPANY SHALL IDENTIFY THE THIRD-PARTY MATERIALS PRIOR TO PROVIDING THE SAME TO CUSTOMER AND GIVE CUSTOMER THE OPPORTUNITY TO REVIEW AND AGREE TO THE APPLICABLE THIRD PARTY TERMS.

7.    **Term; Termination.**

7.1.    Term. This Master Software as a Service Agreement shall be valid from the Effective Date and shall remain in full force and effect until terminated in accordance with Section 7.2 below. The term of each Service Order shall be as set forth in such Service Order ("**Term**").

7.2.    Termination. This Agreement (including each individual Service Order) may be terminated by either Party upon delivery of written notice of termination to the other Party, as follows:

(a)    if the other Party fails to perform or observe any material term or condition in the Agreement and fails to cure such breach within thirty (30) days after receipt of written notice of such breach from the non-breaching Party; or

(b)    if the other Party (i) makes a general assignment for the benefit of creditors, (ii) admits in writing its inability to pay debts as they become due, (iii) voluntarily files a petition or similar document initiating any bankruptcy or reorganization proceeding, or (iv) involuntarily becomes the subject of a petition in bankruptcy or reorganization proceeding and such proceeding shall not have been dismissed or stayed within sixty (60) days after such filing.

(c)    by either providing thirty (30) day prior, written notice of termination after all open Service Orders have been completed.

7.3.    Effect of Termination. Upon termination of the Agreement, each Party shall promptly return, or at the other Party's request, destroy (and provide confirmation of such destruction signed by a legal officer), all Confidential Information of the other Party (including without limitation the Data and any documentation related to the Company Materials). Customer shall also return or destroy (and provide confirmation of such destruction signed by a legal officer) any Company Materials including any Software provided to Customer in object code form. Sections 1, 4, 5, 6.3, 7.3, 8, 9, 10 and 11 hereunder shall survive termination of the Agreement for any reason. All other rights and obligations of the Parties under the Agreement shall expire upon termination of the Agreement.

7

*innovaccer*

8. **Confidentiality**

8.1.     Confidential Information. In connection with the Agreement each Party (as the **"Disclosing Party"**) may disclose or make available Confidential Information to the other Party (as the **"Receiving Party"**). Subject to Section 8.2, **"Confidential Information"** means information in any form or medium (whether oral, written, electronic or other) that the Disclosing Party considers confidential or proprietary, including information consisting of or relating to the Disclosing Party's technology, trade secrets, know-how, business operations, plans, strategies, customers, and pricing, and information with respect to which the Disclosing Party has contractual or other confidentiality obligations, in each case whether or not marked, designated or otherwise identified as "confidential". Without limiting the foregoing: all Company Materials are the Confidential Information of Company and the financial terms and existence of the Agreement are the Confidential Information of each of the parties.

8.2.     Exclusions. Confidential Information does not include information that the Receiving Party can demonstrate by written or other documentary records: (a) was rightfully known to the Receiving Party without restriction on use or disclosure prior to such information being disclosed or made available to the Receiving Party in connection with the Agreement; (b) was or becomes generally known by the public other than by the Receiving Party's or any of its representatives' noncompliance with the Agreement; (c) was or is received by the Receiving Party on a non-confidential basis from a third party that was not or is not, at the time of such receipt, under any obligation to maintain its confidentiality; or (d) the Receiving Party can demonstrate by written or other documentary records was or is independently developed by the Receiving Party without reference to or use of any Confidential Information.

8.3.     Protection of Confidential Information. As a condition to being provided with any disclosure of or access to Confidential Information, the Receiving Party shall:

(i)      not access or use Confidential Information other than as necessary to exercise its rights or perform its obligations under and in accordance with the Agreement;

(ii)     except as may be permitted by and subject to its compliance with Section 8.4, not disclose or permit access to Confidential Information other than to its Representatives who: (i) need to know such Confidential Information for purposes of the Receiving Party's exercise of its rights or performance of its obligations under and in accordance with the Agreement; (ii) have been informed of the confidential nature of the Confidential Information and the Receiving Party's obligations under this Section 8.3; and (iii) are bound by confidentiality and restricted use obligations at least as protective of the Confidential Information as the terms set forth in this Section 8.3;

(iii)    safeguard the Confidential Information from unauthorized use, access or disclosure using at least the degree of care it uses to protect its similarly sensitive information and in no event less than a reasonable degree of care; and

(iv)     ensure its Representatives' compliance with, and be responsible and liable for any of its Representatives' non-compliance with, the terms of this Section 8.

8.4.     Compelled Disclosures. If the Receiving Party is compelled by applicable law to disclose any Confidential Information then, to the extent permitted by applicable law, the Receiving Party shall: (a) promptly, and prior to such disclosure, notify the Disclosing Party in writing of such requirement so that the Disclosing Party can seek a protective order or other remedy or waive its rights under Section 8.3; and (b) provide reasonable assistance to the Disclosing Party in opposing such disclosure or seeking a protective order or other limitations on disclosure. If the Disclosing Party waives compliance or, after providing the notice and assistance required under this Section 8.4, the Receiving Party remains required by law to disclose any Confidential Information, the

8

*innovaccer*

Receiving Party shall disclose only that portion of the Confidential Information that the Receiving Party is legally required to disclose and, on the Disclosing Party's request, shall use commercially reasonable efforts to obtain assurances from the applicable court or other presiding authority that such Confidential Information will be afforded confidential treatment.

   8.5.    Remedies.  The Receiving Party agrees that a breach of this Section 8 may result in immediate and irreparable harm to the Disclosing Party that money damages alone may be inadequate to compensate. Therefore, in the event of such a breach, the Disclosing Party will be entitled to seek equitable relief, including but not limited to a temporary restraining order, temporary injunction or permanent injunction without the posting of a bond or other security.

9.   **Limitation on Damages**.
   9.1.    EXCLUSION OF CERTAIN DAMAGES.  IN NO EVENT WILL COMPANY OR ANY OF ITS LICENSORS, SUBCONTRACTORS OR SUPPLIERS BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ITS SUBJECT MATTER UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY AND OTHERWISE, FOR ANY: (a) LOSS OF PRODUCTION, USE, BUSINESS, REVENUE OR PROFIT OR DIMINUTION IN VALUE; (b) IMPAIRMENT, INABILITY TO USE OR LOSS, INTERRUPTION OR DELAY OF THE SERVICES, (c) LOSS, DAMAGE, CORRUPTION OR RECOVERY OF DATA, OR BREACH OF DATA OR SYSTEM SECURITY, OR (d) CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED OR PUNITIVE DAMAGES, REGARDLESS OF WHETHER SUCH PERSONS WERE ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

   FURTHER, CUSTOMER ACKNOWLEDGES AND AGREES THAT THE SOFTWARE, SERVICES, AND COMPANY MATERIALS ARE TOOLS THAT ARE NOT INTENDED TO BE A SUBSTITUTE FOR THE EXERCISE OF CLINICAL JUDGMENT OR DECISION-MAKING.  CUSTOMER AND THE USERS SHALL BE SOLELY RESPONSIBLE FOR (I) DETERMINING THE EXTENT (IF ANY) TO WHICH THE SOFTWARE, THE SERVICES, OR ANY COMPANY MATERIALS ARE USED IN MAKING MEDICAL JUDGMENTS, AND (II) THE RESULTS OF SUCH DETERMINATIONS AND ANY AND ALL TREATMENT DECISIONS BASED THEREON.  COMPANY EXPRESSLY DISCLAIMS ANY AND ALL RESPONSIBILITY FOR ANY MEDICAL ERRORS, INJURIES, OR SIMILAR CLAIMS ARISING FROM CUSTOMER'S OR USERS' USE OR MISUSE OF THE SOFTWARE, SERVICES, AND COMPANY MATERIALS.

   9.2.    CAP ON MONETARY LIABILITY. OTHER THAN COMPANY'S BREACH OF ITS OBLIGATIONS IN THE BUSINESS ASSOCIATE AGREEMENT, IN NO EVENT WILL THE AGGREGATE LIABILITY OF COMPANY UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ITS SUBJECT MATTER, UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY AND OTHERWISE, EXCEED THE FEES PAID OR PAYABLE BY CUSTOMER UNDER THE APPLICABLE SERVICE ORDER IN THE TWELVE-MONTH PERIOD PRIOR TO THE EVENT GIVING RISE TO LIABILITY. CUSTOMER ACKNOWLEDGES THAT THE AMOUNTS PAYABLE HEREUNDER ARE BASED IN PART ON THESE LIMITATIONS.  THE PARTIES AGREE THAT THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. ADDITIONALLY, NOTWITHSTANDING ANYTHING TO THE CONTRARY, IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE COMPANY FOR BREACH OF HIPAA AND/OR A BUSINESS ASSOCIATE AGREEMENT EXECUTED BETWEEN THE PARTIES EXCEED $5,000,000 (USD FIVE MILLION ONLY).

10. **Indemnification**.

9

**innovaccer**

10.1.    <u>Company Indemnification</u>. Company shall indemnify, defend and hold harmless Customer and Customer's officers, directors, employees and agents (each, a "Customer Indemnitee") from and against any losses, damages, expenses (including reasonable attorney fees) or liabilities incurred by Customer Indemnitee arising out of a third party claim or action alleging that Customer's use of the Software (excluding Data and Third Party Materials) in compliance with this Agreement (including the specifications provided by Company) infringes a U.S. intellectual property right. The foregoing obligation does not apply to any action or claim arising out of or relating to any: (i) access to or use of the Services or Company Materials in combination with any hardware, system, software, network or other materials or service not provided or authorized in writing by Company; (ii) modification of the Services or Company Materials other than: (i) by or on behalf of Company; or (ii) with Company's written approval in accordance with Company's written specification; or (iii) failure to timely implement any modifications, upgrades, replacements or enhancements made available to Customer by or on behalf of Company; or (iv) act, omission or other matter/issue described in Section 10.2 clauses (i), (ii), (iii) or (iv).

10.2.    <u>Customer Indemnification</u>. Customer shall defend, indemnify and hold harmless Company and its Representatives from any actions, claims, losses, damages, expenses (including reasonable attorney fees) or liabilities incurred by Company or the foregoing entities based on or arising out of: (i) Company's access, use, storage or processing of Data or Customer Systems or any other materials or information (including any documents, data, specifications, software, content or technology) provided by or on behalf of Customer or any User; (ii) Customer's or Users' access and use of the Company Materials or Third Party Materials in violation of the terms under the Agreement or applicable third party terms; or (iii) any violation of the User Terms by any User or any claims made or action taken by any User against Company; or (iv) gross negligence or more culpable act or omission (including recklessness or willful misconduct) by Customer, any User, or any third party on behalf of Customer or any User in connection with this Agreement.

10.3.    <u>Indemnification Procedure.</u> Each Party shall promptly notify the other party in writing of any claim or action for which such party believes it is entitled to be indemnified pursuant to Section 10.1 or Section 10.2, as the case may be. The Party seeking indemnification (the "Indemnitee") shall cooperate with the other Party (the "Indemnitor") at the Indemnitor's sole cost and expense. The Indemnitor shall immediately take control of the defense and investigation of such action and shall employ counsel of its choice to handle and defend the same, at the Indemnitor's sole cost and expense. The Indemnitee's failure to perform any obligations under this Section 10.3 will not relieve the Indemnitor of its obligations under this Section 10 except to the extent that the Indemnitor can demonstrate that it has been materially prejudiced as a result of such failure. The Indemnitee may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing.

10.4.    <u>Mitigation</u>. If any of the Software are, or in Company's opinion are likely to be, claimed to infringe, misappropriate or otherwise violate any third-party intellectual property right, or if Customer's or any User's use of the Software is enjoined or threatened to be enjoined, Company may, at its option and sole cost and expense: (i) obtain the right for Customer to continue to use the Software as contemplated by this Agreement; (ii) modify or replace the Software, in whole or in part, to seek to make the Software (as so modified or replaced) non-infringing, while providing equivalent features and functionality, in which case such modifications or replacements will constitute Software under this Agreement; or (iii)by written notice to Customer, terminate this Agreement and require Customer to immediately cease any use of the Software and Company Materials or any specified part or feature thereof, subject to Customer's compliance with its post-termination obligations, Customer will be entitled to a refund of any pre-paid Fees for the terminated portion of the Agreement.

10

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

*innovaccer*

10.5.    Sole Remedy. THIS SECTION 10 SETS FORTH CUSTOMER'S SOLE REMEDIES AND COMPANY'S SOLE LIABILITY AND OBLIGATION FOR ANY ACTUAL, THREATENED OR ALLEGED CLAIMS THAT THIS AGREEMENT OR ANY SUBJECT MATTER HEREOF (INCLUDING THE SERVICES AND COMPANY MATERIALS) INFRINGES, MISAPPROPRIATES OR OTHERWISE VIOLATES ANY THIRD-PARTY INTELLECTUAL PROPERTY RIGHT.

11. **Miscellaneous**.

11.1.    Assignment and Subcontracting. Neither Party may assign, sublicense, delegate or otherwise transfer any of its rights or obligations under the Agreement without the prior written consent of the other Party. Notwithstanding the foregoing, either Party may, without the consent of the other Party, assign the Agreement to an entity merging with, consolidating with, or purchasing substantially all its assets or stock, provided that the Party assuming obligations agrees to do so in writing and has adequate resources to meet its obligations hereunder.

Company shall be permitted to use subcontractors to fulfill its obligations under the Agreement provided that it shall be fully responsible for any and all actions and omissions of its subcontractors.

11.2.    Entire Agreement. The Agreement, any exhibits and amendments thereto, and other documents as may be expressly referenced in the foregoing documents (including User Terms) constitute the entire agreement between the Parties and supersede all previous agreements, oral or written, with respect to the subject matter of the Agreement. This Agreement may not be amended without the prior written consent of both Parties.

11.3.    Force Majeure. Except for payment obligations, if either Party is prevented from performing or is unable to perform any of its obligations under the Agreement due to causes beyond the reasonable control of the Party invoking this provision, including but not limited to acts of God, acts of civil or military authorities, riots or civil disobedience, wars, pandemic, third party strikes or labor disputes (other than those limited to the affected Party) (each, a "**Force Majeure Event**"), such Party's performance shall be excused and the time for performance shall be extended accordingly provided that the Party affected immediately notifies the other Party and immediately takes all reasonably necessary steps to resume full performance. If Force Majeure Event lasts for more than 30 days, then either Party may terminate the Agreement.

11.4.    Governing Law. The validity, interpretation, construction and performance of the Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the Parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THE AGREEMENT.

11.5.    HIPAA. The Parties agree to comply with the Health Information Technology for Economic and Clinical Health Act of 2009 (the "**HITECH Act**"), the Administrative Simplification provisions of Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. Section 1320 d ("**HIPAA**") and any current and future regulations promulgated under either the HITECH Act or HIPAA, all as may be amended from time to time, (collectively referred to herein as "**HIPAA Requirements").** The Parties agree not to use or further disclose any Protected Health Information (as defined in the Federal Privacy Regulations) or Electronic Protected Health Information (as defined in the Federal Security Regulations), other than as permitted by the HIPAA Requirements

11

*innovaccer*

and the terms of the Agreement. In addition, the Parties have executed a separate Business Associate Agreement on September 21, 2021 as required by the HIPAA Requirements.

11.6.    Restricted Rights. If Customer is an agency, department or entity of the United States Government ("**Government**"), Customer agrees, that (i) use, reproduction, release, modification or disclosure of the Software, or any part thereof, including technical data, is restricted in accordance with Federal Acquisition Regulation ("**FAR**") 12.212 for civilian agencies and Defense Federal Acquisition Regulation Supplement ("**DFARS**") 227.7202 for military agencies, (ii) the Software is a commercial product, which was developed at private expense, and (iii) use of the Software by any Government agency, department or other agency of the Government is further restricted as set forth in the Agreement.

11.7.    Equal Opportunity. The equal opportunity clauses at 41 CFR 60-1.4, 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a) are hereby incorporated by reference into this Agreement to the extent applicable to the Company. These regulations prohibit discrimination against qualified individuals on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, disability, and status as a protected veteran, and require the contractor to take affirmative action to employ and advance in employment qualified individuals without regard to their race, color, religion, sex, sexual orientation, gender identity, national origin, disability and protected veteran status.

11.8.    Import and Export Requirements. Customer acknowledges and agrees that the Software is subject to export control laws and regulations.  Customer may not download or otherwise export or re-export the Software or any underlying information or technology except in full compliance with all applicable laws and regulations, in particular, but without limitation, United States export control laws.

11.9.    Relationship of Parties**.** The Parties are independent contractors and will have no right to assume or create any obligation or responsibility on behalf of the other Party.  Neither Party shall hold itself out as an agent of the other Party.  This Agreement will not be construed to create or imply any partnership, agency, joint venture or formal business entity of any kind.

11.10.   Severability. If any provision of the Agreement is held invalid or unenforceable, it shall be replaced with the valid provision that most closely reflects the intent of the Parties and the remaining provisions of the Agreement will remain in full force and effect.

11.11.   Waiver.  No delay or failure by either Party to exercise any right or remedy under the Agreement will constitute a waiver of such right or remedy. All waivers must be in writing and signed by an authorized representative of the Party waiving its rights. A waiver by any Party of any breach or covenant shall not be construed as a waiver of any succeeding breach of any other covenant.

In Witness hereof, the Parties hereto have executed this Master Software as a Service Agreement by persons duly authorized as of the date and year first above written.

**THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK.  SIGNATURE PAGE TO FOLLOW.**

**◢ innovaccer**

INNOVACCER INC.

Fallon Community Health Plan, Inc.:

By:_____

Name: Sandeep Gupta

Title: CO-Founder & COO

Date: 1/6/2022

By:_____

Name: Todd Bailey

Title: SVP & CFO

Date: 1/5/2022

2

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

 innovaccer

**Exhibit A**
**Service Level Agreement**

1. **Applicability**. This Service Level Agreement and Company's obligations herein shall be applicable for Software deployed on cloud or on the Company's environment. Any Software installed on Customer systems or environment shall not be governed by this Service Level Agreement.

2. **Standard Support**. Company shall provide Customer email support which shall be available Monday through Friday, 7:00 a.m. to 6:00 p.m. local time, excluding holidays.

   **Conditions for Providing Support**. Company's obligation to provide support services is conditioned upon the following: (a) Customer makes reasonable efforts to solve the problem after consulting with Company; and (b) Customer provides Company with sufficient information and resources to correct the problem, as well as access to the personnel, hardware, and any additional systems involved in discovering the problem.

   **Exclusions from Company's Support Services**. Company is not obligated to provide support services in the following situations: (a) the problem is caused by Customer's negligence, hardware malfunction or other causes beyond the reasonable control of Company; (b) the problem is with third party software not licensed through Company; (c) the problem is with individual user's desktop or browser software; or (d) Customer has not paid fees under the Agreement when due.

   **Support Levels**: Company will provide Level 2 Technical Support, and expects Customer to perform Level 1 Technical Support Service Desk capabilities (L1 Support), which primarily involves - user access management, answering user queries, triaging issues to differentiate user's system vs. Company product issues. Company will provide product training along with documentation to Customer's L1 Support team. As used herein, Level 1 Technical Support means first-line technical support for Users. Tier 1 Support includes: (a) acting as the primary point of contact with the Users for all general support issues, such as "How to" and basic troubleshooting; (b) gathering information from the User; (c) analyzing the reported symptoms and attempting to identify the underlying problem; and (d) following troubleshooting flows provided by the Company to isolate and resolve issues. Level 2 Technical Support means: (i) the advanced technical troubleshooting for issues that were unable to be resolved by Tier 1 Technical Support and (ii) the support for issues affecting all customers of the Software.

3. **Software Availability**.

   Company will use commercially reasonable efforts to maintain the availability of the Software to the Customer and Users as follows:

| Service Category | Availability/Response Time |
|---|---|
| Quarterly Availability / Uptime | 99.00% |

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

**innovaccer**

| | |
|---|---|
| *The availability percentage does not include interruptions due to Scheduled Downtime or Force Majeure or Exclusions in section 3.1 below.* | |
| Scheduled Downtime | 1:00 am – 1:30 am local time weekly on Saturdays, or as Company otherwise notifies Customer no less than 1 business day in advance. |
| Frequency of back-ups of user data and configuration data | One incremental back-up per day until 30 days after the end of an active event. All the data is retained for a year. |

**Exclusions**.  Company shall have no liability for lack of availability due to: (1) outages caused by the failure of public network or communications components, (2) user errors, or (3) unauthorized use or misuse by Customer or anyone other than Company using any of the Customer passwords, provided that Company has taken industry standard steps to protect the Software from unauthorized access, intrusion, and disruption.

**Customer Reporting**.  Customer shall report any unscheduled system downtime and any error, bug, or defect in the Software within a reasonable amount of time upon becoming aware or receiving notice of such system downtime, error, bug, or defect.

**Sole Remedies for Failure to Meet the Service Availability Level Commitment**. For each calendar month in which Company has uptime of:

    1.    less than 99% but above 95%, Company shall within thirty (30) days of the end of the current quarter, provide Customer with a written plan for improving Company's Software uptime to attain 99% Software uptime and Company shall promptly implement such plan;

    2.    between 94.95% and 90%, Company shall within thirty (30) days of the end of that current quarter, provide Customer with a service credit in an amount equal to five (5%) percent of the monthly fee and the action plan under subpart (a) above; or

    3.    less than 90%, Company shall within thirty (30) days of the end of that current quarter, provide Customer with a service credit in an amount equal to ten percent (10%) the monthly fee and the action plan under subpart (a) above.

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1



Company shall provide Customer a quarterly report of uptime in the prior quarter.

THIS SECTION 3 SETS FORTH CUSTOMER'S SOLE AND EXCLUSIVE REMEDY, AND COMPANY'S ENTIRE LIABILITY, FOR ANY FAILURE TO MEET THE SOFTWARE UPTIME COMMITMENT.

1.    **Error Corrections and Updates**.

      **Definitions**.

1.    "Error" means a failure of the Software to conform to the documentation, resulting in the inability to use, or material restriction in the use of the Software.

2.    "Maintenance Release" means a revision of the Software released by Company to its customers generally, to correct Errors in the Software or to maintain the operation of the Software in accordance with the documentation.

| Severity | Examples | Initial Response Time |
|---|---|---|
| **Severity One:  CRITICAL**<br><br>Business critical functionality is inoperable or critical interface has failed. This usually applies to a production environment and indicates an inability to access services resulting in a critical impact on operations. This condition requires an immediate solution. | Production system is down or crashing frequently<br><br>A business critical operation cannot be performed | < 2 hours |
| **Severity Two:  HIGH**<br><br>Significant loss of application functionality or performance resulting in high number of users unable to perform their normal functions. Major feature/product failure; inconvenient workaround or no workaround exists. The program is usable but severely limited. | Production system functioning with limited capabilities<br><br>System unstable with periodic interruptions | < 6 hours |
| **Severity Three:  MEDIUM**<br><br>Moderate loss of application functionality or performance resulting in limited users impacted in their normal functions. Minor feature/product failure, convenient workaround exists/minor performance degradation. | Errors in production systems but still fully functional<br><br>Malfunction in non-critical functions | < 1 business day |

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

**◈ innovaccer**

| Severity Four: LOW

The issue consists of "how-to" questions including issues related to one or multiple modules and integration, and inquiries, enhancement requests, or documentation questions. | Need clarification of procedures or information in documentation

Attributes or options do not operate as stated

Software enhancement requests

Documentation is incorrect | < 2 business days |
|---|---|---|

Sole Remedies for Failure to Meet the Response Times for Error Correction.

If Company is unable to meet the response times committed above for Error corrections:

    (i)        two times in any given month, Company shall provide credits to Customer of an amount equal to five (5%) percent of the monthly fee (for that month) attributed to the affected Software.

    (ii)       consecutively for 2 months in a row, Company shall provide credits to Customer of an amount equal to ten (10%) percent of the monthly fee (for the second month) attributed to the affected Software.

THIS SECTION 4 SETS FORTH CUSTOMER'S SOLE AND EXCLUSIVE REMEDY, AND COMPANY'S ENTIRE LIABILITY, FOR ANY FAILURE TO MEET THE RESPONSE TIMES FOR ERROR CORRECTIONS.

**Maintenance Releases**. During the Term, Company shall make the Maintenance Releases available to Customer if, as and when Company makes any such Maintenance Release generally available to its customers. If a question arises as to whether a Software offering is an upgrade or a new product or feature, Company's opinion shall prevail, provided that Company treats the Software offering consistently for its customers generally.

# EXHIBIT B

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

## SERVICE ORDER

THIS SERVICE ORDER ("**Service Order**") is made and entered into as of January 1, 2022 ("**Effective Date**") between Fallon Community Health Plan, Inc. (**"Customer")** and Innovaccer Inc., (**"Company")** in connection with the Master Software as a Service Agreement with an effective date of January 1, 2022 executed between Customer and Company ("**Agreement**").

This Service Order is subject to and supplements the Agreement with respect to the subscription of certain software products and the provision of certain Services described below ("**Project**"), by Company to Customer and is expressly incorporated into and made a part of the Agreement. Capitalized terms used in this Service Order shall have the meanings ascribed to them in the Agreement unless defined herein.

1.    **Scope**. Company will provide access to the following solutions under this Service Order in accordance with Section 2 of the Agreement:

- **Gaps identification analytics**
- **Gaps performance analytics and dashboards**
- **Platform Services powered by Data Activation Platform (DAP)**
- **Provider Engagement powered by InNote**

Customer understands that any user of the Software provided as part of these solutions shall have to agree to the online or clickwrap end user terms of use for such Software.

The Statement of Work, attached hereto as Attachment 1 contains a description of the solutions and the understanding of the Parties regarding the Project and timelines.

**Ancillary tools:** Company shall also employ reasonable efforts to provide Customer with access to a project management tool and support ticketing system tool as described in the Statement of Work. Access to and use of such tools shall be subject to the restrictions in Section 2 of the Agreement, but inability to provide such tools shall not be deemed as a breach by Company of its obligations under the Agreement or this Service Order. Further, Company does not make any commitments regarding the uptime and support availability for such tools and the Service Level Agreement shall not be applicable to such tools.

2.    **Term**.

A.    Term.  This Service Order will have an initial term of three (3) years (the "**Initial Term**"), which shall commence as of the Effective Date. Following the Initial Term, this Service Order shall automatically renew for additional, successive terms of three (3) years each (each a "**Renewal Term**"), unless Customer provides written notice of its intent of non-renewal at least 30 days before the expiration of the Initial Term or any such Renewal Terms if applicable. The Initial Term, together with any such Renewal Terms, if applicable, is collectively the "**Term**".

B.    Termination. Customer does not have the right to terminate the Service Order before the expiry of the Initial Term and agrees to pay all fees and charges for the Initial Term. If Customer wishes to terminate this Service Order during the Renewal Term for convenience, Customer shall have to provide 6 months' prior

written notice to Company and pay all fees and other charges hereunder for those 6 months, as consideration for being granted the right to terminate this Service Order for convenience. Company will not be required to refund any amounts paid for the Term.

3.    **Fees and other charges**.

A.  **Subscription Fees**. Customer shall pay at the following rates under this Service Order starting from the Effective Date, *subject to the Minimum Commitment below*:

| Number of Members | Subscription Fees (per Member per month) for Gaps identification analytics, Gaps performance analytics and dashboards and Platform Services | Subscription Fees (per Member per month) for Provider Engagement |
|---|---|---|
| Up to 50,000 | $0.59 | $0.42 |
| 50,001 to 100,000 | $0.51 | $0.36 |
| 100,001 to 250,000 | $0.43 | $0.28 |
| 250,001 to 500,000 | $0.36 | $0.21 |
| 500,000 and above | $0.24 | $0.15 |

This is an incremental pricing model (i.e., lower rates apply only to number of Members mapped to that tier). For example, assuming Customer has 60,000 Members, it would bring the total monthly Subscription fee  in this sub clause 3(A) to $ 59,200= (50,000*0.59+10,000*0.51) for Gaps identification analytics, Gaps performance analytics and dashboards and Platform Services (Data Activation Platform) + (50,000*0.42 + 10,000*0.36) for Provider Engagement, as per the above rates.

Customer commits to a minimum payment for 10,000 Members throughout the Term even if the actual number of Members being loaded/integrated in the Platform is less than 10,000 ("**Minimum Commitment**").

The number of Members shall be counted based on the number of attributed lives/patients loaded on the Platform in a month.

For the sake of clarity, "Member" means an individual enrollee in any healthcare plan associated with Customer or Customer's clients (including any individual undergoing any treatment, medical check-up or medical test).

B.  **Data feed/source charges.** For any data feed integrated by Company, Company shall charge $500 per data feed per month.

Customer shall be required to pay Company for the full Term for all data feeds or sites integrated by Company hereunder, even if any feed or site shuts down or goes out of Customer's network subsequently.

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

C. **Travel Expenses.**  Customer shall reimburse Company for reasonable out-of-pocket travel and lodging expenses ("T&E") incurred by Company in connection with performing Services.

D. **Infrastructure Charges.**  All IT infrastructure charges incurred by Company shall be billed to Customer on actuals and Customer shall pay for the same in addition to the fees and other charges herein.

E. **Third Party Charges.**  If Company is required to work, collaborate, interact or integrate with any third parties (like EMR/EHR) or their systems upon Customer's request or as part of its obligations hereunder, Customer shall be responsible for directly (i) entering into required agreements with such parties to enable Company's access and/or interaction with such third parties and for (ii) paying any charges imposed by such third parties.

F. **Charges for Additional Features**. The standard features of the Company's solutions have been specified in the Statement of Work below. Any features or services not covered in the Statement of Work including any customization or enhancements shall be mutually agreed upon in writing signed by the parties in advance work being done, and shall be billed by Company separately at $160 per hour based on the actual effort undertaken by Company in providing/building such features, customizations or services.

G. **Payment.**

Customer shall pay the Subscription Fees in Subsection 3A in advance for every three (3) months starting from the Effective Date, based on the Minimum Commitment.

The number of Members actually integrated and managed by Company shall be reconciled on a quarterly basis and the corresponding additional fees (i.e., the fees calculated for the actual number of Members above the Minimum Commitment of 10,000) shall be invoiced accordingly

All other fees and charges in Section 3 shall be paid by Customer on a monthly basis upon Company's issuance of invoice.

H. **Contact for sending Invoices**. Company shall send invoices to:

Customer contact name, e-mail and contact number: Accountspayablemailbox@fallonhealth.org

Copy to (name, e-mail & contact number): Peter Morris, peter.morris@fallonhealth.org

Customer shall notify Company promptly in case of any changes to the above details.

4.    **Browser/OS compatibility.** Customer understands and acknowledges that the Products shall only be compatible with the browsers and operating systems specified below.

- OS*:* Windows 7 and above / Windows 8 above preferred
- Browser: Chrome

3

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

Company shall have no obligation to make its Products compatible with any other operating systems or browsers or versions mentioned herein.

5.    **Provider Engagement Risk Adjustment functionality.**

Parties acknowledge and Customer agrees that Innovaccer software and applications are provided for informational purposes only and Innovaccer makes no representation whatsoever as to the appropriate plan of care, selection of treatment for any individual, or the presence or non-presence of a given condition or corresponding diagnostic code as this is exclusively within the professional judgment of the individual's treating clinician. Innovaccer expressly makes no representation, statement, promise, or guarantee that the potential codes identified by the application are appropriate for any given individual or will be appropriate for risk adjustment submission, coverage or payment by any health plan or government or state program. As with all claims for reimbursement, the selection of codes remains the sole responsibility of healthcare providers, and Customer is strongly encouraged to consult current and authoritative coding publications, individual plan and government policies, manuals, and newsletters, and to speak with their third-party payers as needed with specific questions about coverage, coding, and payment policies. Third-party reimbursement for health care items and services is affected by numerous factors, and this document does not address all of the laws, rules, or policies that are associated with coverage or payment for services.

**IN WITNESS WHEREOF**, in consideration of the promises, mutual covenants and agreements set forth above and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company and Customer have executed this Service Order as of the date hereof.

**Customer**

Fallon Community Health Plan, Inc.

By: _Todd Bailey_
      0805FC1CE3094D5...
Name: Todd Bailey

Title: SVP & CFO

Date: 1/5/2022

**Company**

Innovaccer Inc.

By: _Sandeep_
      A16918E5FC054E3...
Name: Sandeep Gupta

Title: CO-Founder & COO

Date: 1/6/2022

4

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

**ATTACHMENT 1**

**STATEMENT OF WORK**

**Solution details**

The Company will deliver the following digital technology solution to the Customer:

- **Gaps identification analytics:** identify open and suspect Medicare Advantage CMS-HCC coding gaps and/or Medicaid DxCG coding gaps for a target set of Customer members with active Medicare and/or Medicaid health plan coverage
  - Company calculation of open Medicare Advantage CMS-HCC coding gaps and open Medicaid DxCG coding gaps for a target set of Medicare Advantage and Medicaid members, respectively
  - Identification of drop codes driven by diagnosis codes present in earlier plan years, and likely present in the current plan year
  - Identification of suspect codes driven by clinical algorithms to identify high potential, clinically-inferred codes based on medications, lab results, and/or co-morbidity insights
  - Full incorporation of code hierarchies into gaps identification analytics

- **Gaps performance analytics and dashboards:** highlight performance and support reporting on key performance indicators (KPIs) for both Payer and Provider end users within respective interfaces
  - Run risk adjustment operational metrics analytics, data permitting (e.g., AWV rate, provider weekly active users)
  - Run risk adjustment outcomes metrics analytics, data permitting, such as:
    - Dashboards with RAF details & risk capture trends for tracking of relevant insights on rising risk, potential recapture opportunity (RAF), yearly trends, and view by various cuts of specific coding gaps, diagnosis categories, and/or provider
    - Drill down into identified dropped and/or suspect codes to arrive at deeper segmentation
  - Stand up dashboards for both Payer and Provider end users

- **Platform services powered by Data activation platform (DAP):** foundational infrastructure to support gaps performance solution components noted above
  - Incorporation of data needed for gaps identification analytics and gaps performance analytics & dashboards from either the Customer and/or Customer's third party vendors (e.g., claims data, clinical data)
    - Platform Services supports a wide range of data exchange protocols and data formats for exchange of these critical open gaps detail inputs-- this process would

5

involve ingestion of historical data, and setup of an ongoing data feed with agreed-upon update cadence

- ○ Incorporation of Customer-provided inputs on target Providers and target Members, as well as Member - Provider attribution where needed
  - Target Providers covering Providers who should be targeted for InNote deployment (where applicable)
  - Target Members on which gaps details will be offered to Target Providers
  - Member - Provider attribution in case target Providers will only be shown gaps for attributed Members

- **Provider engagement powered by InNote:** drive closure of open coding gaps through InNote point of care engagement of select Provider end users mutually agreed-upon for targeting between Customer and Company
  - ○ Open coding gap insights as noted above would be incorporated into the InNote interface, and displayed for a target set of providers during target members' clinic visits
  - ○ Specific InNote gaps display logic would be configured with Customer input (e.g., level of usage of Member - Provider attribution, provider selection options within gaps insights workflow, display of relevant clinical evidence where available)
  - ○ Broad EMR compatibility with user-friendly features readily incorporated (e.g., auto-trigger slide-out, single sign-on capabilities)

**Key deliverables and sign-off criteria**

Key deliverables and sign-off criteria are focused on driving the closure of coding gaps, and would be timed per the overall sequence of solution deployment agreed upon between Customer and Company in writing.

| Deliverables | Sign-off criteria |
|---|---|
| **Platform services (DAP) deployment** | The Data Activation Platform (DAP) is successfully deployed for the Customer with agreed-upon infrastructure hosting approach to complete Platform Services foundations needed for downstream requirements |
| **Customer data sources integration** | Successful connectivity and ingestion of historical data from Customer data sources needed for gaps identification and/or gaps performance analytics |
| **Open Medicare CMS-HCC coding gaps identification** | Identification of open CMS-HCC coding gaps with Company-driven analytics utilizing Customer-provided data inputs |
| **Open Medicaid DxCG coding gaps identification** | Identification of open CMS-HCC coding gaps with Company-driven analytics utilizing Customer-provided data inputs |

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

| | |
|---|---|
| **Performance dashboards for Provider end users** | Agreed-upon performance dashboards are available to target provider end users |
| **Performance dashboards for Payer end users** | Agreed-upon performance dashboards are available to target payer end users |
| **Provider engagement InNote application for desktop computers is installed** | Target provider end users at practice sites have the Provider Engagement InNote application installed on their desktop computers with Windows operating systems |
| **Provider end users are trained on InNote usage** | Provider end users (e.g., physicians, medical assistants) are trained on InNote and/or provider portals gaps workflow and solution usage |
| **Flagging of open gaps for target members to providers** | Open HCC coding gaps and quality gaps presented to providers per agreed-upon workflow (i.e., InNote triggered to pop-in, availability within provider portal) |
| **Demonstrated provider satisfaction** | Innovaccer tracks provider satisfaction via user satisfaction surveys |

Table. Key deliverables and sign-off criteria for solution.

**Implementation approach**

Company follows a rigorous 6-phase implementation approach starting from onboarding to final end-user feedback of the solution implemented, as summarized in the below diagram:



The key phases in Company's implementation approach are further summarized below:

1. **Onboarding**

   To methodically and comprehensively tackle the complexities associated with the project, we propose a robust engagement and onboarding process which will focus on validating our understanding of customer's requirements and business objectives, establishing a Program Management Office, understanding the existing landscape from system configuration and integration standpoint, robust project planning, and identifying the optimum resources for ensuring program success.

2. **Design**

   In this phase, Company teams will work with customer's subject matter experts to document detailed requirements including dashboard mockups. A gap analysis of as-is workflows with to-be workflows is done to determine how the proposed solution will help the customer move to the desired state. End to end test strategy formulation is done by the customer with optional assistance from the Company team. Finally, an end-user and organization-wide training plan is prepared by the customer which includes acceptance criteria and success metrics from an end user's perspective.

3. **Development**

8

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

This phase would kick off the project for implementation of Company's Platform Services for data extraction and ingestion from required data sources. Company will perform normalization, standardization, and aggregation of the required data, and will push the high-quality data to the Platform Services which powers Company's end user-facing applications. Company will set up a robust data governance structure for user management across the platform for limiting access to specific users, practices, and datasets.

4. **Testing**

During this phase, the Company will use its reusable test scripts and libraries to verify the functionality being delivered. Post-verification, at the start of user acceptance testing, customer will execute the test strategy it had created during the design phase of the project. A sign off from end-users post-validation signifies satisfactory closure of this phase.

5. **Adoption**

The Company will provide post-go-live support and maintenance for the users post the implementation. The key focus in the adoption phase would be on tracking technical & business issues, monitoring of interfaces, addressing project issues, and support services. As the user community becomes acquainted with the system, many processes that were initially efficient may need to be re-examined and hence optimized.

6. **Project management**

At every implementation phase, cadence meetings are conducted to assess the project progress and milestones achieved. Each phase's exit criteria are evaluated and once achieved, entry to the next phase is initiated. In this ongoing phase, Company's and customer's project managers will discuss implementation progress and plan for the upcoming next steps.

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

**Governance structure**

Company proposes to have a governance structure for execution of this implementation. Below mentioned are Company staff members who will be involved in the project and their responsibilities.

| Title | Responsibilities |
|---|---|
| Chief Customer Officer (COO) | - Level 2 Escalation<br>- Mentorship on business outcomes and project management |
| VP - Customer Success Management (VP-CSM) | - Level 1 Escalation<br>- Operational Excellence<br>- Implementation Oversight |
| Customer Success Manager (CSMM) | - Management of account and executive alignment<br>- Customer interaction and communication (weekly, bi-weekly, monthly, quarterly)<br>- Understand, track and improve customer success factors<br>- Manage reports, analytics and UAT |
| Engineering Manager (EM) | - Level 1 Escalation on any technology or product related issues |
| Customer Engagement Manager (CEM) | - Manage project implementation<br>- Gather customer requirements, and translating them to technical team<br>- Configuration of product<br>- Manage deliverables, support, and day to day account management |
| Advisory Team | - Understand customer success factors<br>- Translate customer needs to dashboard / view<br>- Design customer specific care management implementation / workflows |

10

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

In this governance structure, a meeting cadence during the implementation will enable regular tracking of implementation along with the objective of ensuring Customer requirements are met at all times.

| Title | Frequency | Description | Company Attendees | Customer Attendees |
|---|---|---|---|---|
| Governance | Once every two weeks (60 mins) | Leadership discussion on engagement status | VP - AM, AM | President/CEO, CMO, Director - BI, Director |
| Data Acquisition | M, W, F (30 mins) | Review status of data acquisition progress | AM, IM | Director - BI, Data Team |
| Status Updates & Implementation Plan | Weekly (30 mins) | Work discussion and re-prioritization | AM, IM | Director - BI, Data Team |

- VP - CSM = VP Customer Success Management
- CSM = Customer Success Manager
- CEM = Customer Engagement Manager
- BI = Business Intelligence

11

DocuSign Envelope ID: FAA39D98-1B4B-4E0A-9F0B-E56E9B9735B1

**Post go-live support**

Company will collaborate with Customer in the technical support and training of Customer Users. The level of support provided by Company and Customer will be jointly agreed upon by both parties.

1. **Training:** Company will provide hands-on training, in accordance with a train the trainer approach, to the designated Company end users via web-based remote training and on-site where needed. User manuals along with other relevant documentation will be distributed for reference. The training will include all the elements of implementation, configuration, and administration.

2. **Support:** Company has a self-run maintenance module of all services which provides reports on the functioning of every service and data component. Company will check these reports daily to ensure the smooth functioning of the product.

   Company will monitor the platform to debug any issues before support at the L1 level is transitioned to Customer. This period is limited to 5 business days following go live. Support would generally be offered virtually by Company's support team unless on-site support is necessary.

   Company provides support via below mechanisms for problem response and resolution:
   - **Email**: Email support will be available.
   - **Ticketing System**: Company will provide Customer with a ticketing system, wherein Customer's designated end users can key in tickets to raise issues on unintended functioning or non-functioning of the platform along with enhancement requests.



12

## Severity calculator by score, with SLA to be determined with your org

SCORE    8 — 9              6 — 7              3 — 4 — 5          0 — 1 — 2

**CRITICAL**         **HIGH**              **MEDIUM**           **LOW**

Examples:           Examples:            Examples:           Examples:
Platform is down, API calls   Application is slow for all   Minor feature failure on   Password reset, Account
error out making data   users in network     product and workaround   creation, How to use a
access not possible                       exists              feature

Description:        Description:         Description:        Description:
This usually applies to a   Critical loss of application   Moderate loss of   The issue consists of
production environment   functionality or   application functionality   "how-to" questions
and indicates an inability to   performance resulting in   or performance resulting   including issues related to
access services resulting in   high number of users   in limited users impacted   product and integration,
a critical impact on   unable to perform their   in their normal functions.   and inquiries,
operations.         normal functions.                        enhancement requests, or
                                                            documentation questions.

There are four types of support that will be provided:

- **User Support:** Troubleshooting support to use the solution.
- **Knowledge Support:** How to perform a particular workflow using the solution.
- **Technical Support:** Troubleshooting support on technical issues to use the solution.
- **Admin Support:** Administrative support for failed jobs, server issues, or other related issues.

The escalation matrix provided by Company for Customer is as given in the table below:

| # | Data integration | Infra issues | Analytics | Quality | DSA issues | Support & maintenance |
|---|---|---|---|---|---|---|
| 4 | COO | | COO | COO | COO | COO |
| 3 | AVP Delivery | | Director | AVP Delivery | AVP Delivery | AVP Delivery |
| 2 | Practice Head | CPO | DS-3 | Practice Head | DI Practice Head | Director / Associate Director |
| 1 | Lead / Manager | AVP Engineering | DS-2 | Quality Manager | Manager CEA | Team Manager |
| 0 | Module Lead | Lead Infra | DS-1 | Quality Lead | CEA | Support Engineer |

13

# EXHIBIT C



One Chestnut Place ■ 10 Chestnut St. ■ Worcester, MA 01608 ■ 1-508-799-2100 ■ fallonhealth.org

**Sent via Email to Abhinav Shashank at** abhinav.shashank@innovaccer.com **and Dan Guggenheim at** dan.guggenheim@innovaccer.com **and FedEx**

June 2, 2023

Mr. Abhinav Shashank
CEO
Innovaccer, Inc.
535 Mission Street, 14th Floor
San Francisco, California 94105

Mr. Dan Guggenheim
Chief Legal Officer
Innovaccer, Inc.
535 Mission Street, 14th Floor
San Francisco, California 94105

**Re: Fallon Community Health Plan, Inc.'s Notice of Material Breach to Innovaccer, Inc.**

Dear Mr. Shashank and Mr. Guggenheim:

Eighteen months ago, Innovaccer sold Fallon Community Health Plan, Inc. ("Fallon") what it described contractually as a "digital technology solution" yet still today, Innovaccer has failed materially to deliver that solution.

Innovaccer has failed to deliver on most of the key deliverables provided for in Innovaccer's Statement of Work (SOW) included as Attachment 1 to the Service Order incorporated into the Master Software as Service Agreement that Innovaccer and Fallon entered into on January 1, 2022.

At this point, Fallon has paid Innovaccer over $550,000 to develop and deliver to Fallon digital technology solution that still does not perform as sold and as represented in the SOW. Fallon has expended considerable time testing and providing feedback to Innovaccer, yet Innovaccer's inability to address the multiple deficiencies Fallon identifies below continues.

Therefore, pursuant to Section 7.2 (a) of the Master Software as Service Agreement and the Service Order, together "the Agreement", that Innovaccer and Fallon

Community Health Plan, Inc. entered into on January 1, 2022, *this letter serves as Fallon's notice to Innovaccer that Innovaccer has breached the Agreement for its failure to perform material terms and conditions in the Agreement as discussed in this notice.*

Section 7.2 of the Agreement, in pertinent part, provides that the Agreement (including each individual Service Order) may be terminated by either Party "(a) if the Other Party fails to perform or observe a material term or condition in the Agreement and fails to cure such breach within thirty (30) days after receipt of written notice of such breach from the non-breaching Party." Therefore, upon Innovaccer's receipt of this written notice, Innovaccer has thirty (30) days to cure the breach of the material terms identified below in this notice.

If at the end of the cure period Innovaccer fails to cure the breaches identified, Fallon will exercise its option to terminate the Agreement in its entirety including the Service Order and SOW.

According to the Service Order, it "is subject to and supplements the Agreement … and is expressly incorporated into and made part of the Agreement." Because the Service Order "is subject to" the Agreement, Section 7.2 of the Agreement governs termination of the "Agreement (including each Individual Service Order)."

Below are the three principal categories of deliverables Innovaccer is contractually obligated to provide that to date, Innovaccer has failed to perform on most of the key deliverables within each of these categories.

**Data Activation Platform**

According to the Agreement (page 5 of the SOW), Innovaccer's deliverable for the Data Activation Platform (DAP) is the successful deployment for Fallon with agreed-upon infrastructure hosting approach. Instead, the deployment was significantly delayed because of Innovaccer's inability to handle the number of Fallon providers causing Innovaccer to shut down its system. This is especially perplexing given Innovaccer's proposal materials to Fallon that touted its experience with regional and national payers that have much larger provider networks than Fallon.

Today, the DAP Innovaccer delivered to Fallon is still plagued by significant deficiencies.

The DAP is supposed to include Medicare, Medicaid, and Commercial data analytics. To date, Innovaccer has not produced satisfactory Medicaid data analytics. That is a material deficiency in Innovaccer's DAP deliverable referenced in the SOW.

Despite Fallon's requests about the status of Innovaccer's development of the Medicaid data analytics, Innovaccer has been exceedingly slow to respond. Last February, per the SOW, Fallon provided Innovaccer model inputs from DxCG to Innovaccer for Innovaccer to utilize to create the Medicaid dashboard, yet Innovaccer did not make its

Medicaid dashboard samples available to Fallon until late May. And, at this point, the download function for dashboard production is inconsistent; half of the time failing.

Moreover, regarding the Medicaid data analytics, the HCC conditions identified on the Medicaid tab contain extraneous data that should not appear (e.g., age ranges, enrollment durations, etc. are included with the HCC conditions).

Innovaccer still has not loaded data in a consistent cadence, and sometimes data updates are not communicated to Fallon. Also, information that could be loaded apparently still has not been. For example, data in DAP shows that 81% of Fallon Medicare membership needed an annual wellness visit as of December 2022, however, internal Fallon analytics reflect that only 10% of Fallon membership was in need of a wellness visit. This prompts Fallon to question whether all the data elements that Fallon provided Innovaccer have been incorporated into the dashboard analytics.

In addition, the DAP still does not contain an adequate data governance structure. As a result of this lack of data governance, the DAP lacks the capacity to isolate patient data to just the provider organization view.

Because of these persistent deficiencies with the DAP, Fallon is still unable to provide its contracted providers with automated dashboards that will allow them to identify opportunities to improve their risk score. And these deficiencies taken together amount to a material failure in the DAP.

**InNote PACE Pilot**

Under the banner that "InNote addresses Today's challenge of data and having an incomplete view," Innovaccer made numerous representations about InNote's capabilities in a June 27, 2022 demo to Fallon.

Central to Innovaccer's contractual relationship with Fallon is for Innovaccer to deliver to Fallon the InNote tool that, according to the SOW, will drive the closure of open coding gaps through InNote's point of care engagement with provider end users. Instead, what Fallon has received is an InNote product fraught with data inconsistencies and so lacking in functionality that it is not a viable product for Fallon's PACE providers and the Fallon Clinical Documentation Improvement team. These deficiencies, examples of which are provided below, are material.

For example, Innovaccer represented in its InNote demo to Fallon that "without leaving their workflows, Care Teams can now collaborate for real-time solutions." Instead, based on Fallon testing, providers must log into Innovacer/InNote separately from Fallon's NextGen EMR, meaning additional steps to the workflow. The InNote window is immovable so that for providers who use one screen, the essential EMR information is blocked, unless additional time is spent resizing all other windows during each session. Also, there is an inability to open more than one category at a time or to view the list as a whole. When one category opens, it covers the others, obstructing the ability to

3

analyze across categories. This is problematic for repetition, combination coding requirements, and workflow process.

In addition, Fallon testing has also revealed other InNote limitations. Despite Innovaccer's representations that InNote could be streamlined to identify only the code and condition without the category information as Fallon requested, Innovaccer now represents that would not be possible without "losing other vital information."

Moreover, InNote is fraught with data inconsistencies. Innovaccer represented that "InNote gets triggered and presents care gaps and coding opportunities for patients." Fallon testing results show otherwise. For example, despite Innovacer's representation that it refreshes coding gaps yearly, Fallon's test results show that despite InNote's indication that a patient had no coding gaps, the patient had no appointments scheduled for 2023, a coding gap. Moreover, Intelligent Medical Operations ("IMO"), a healthcare data enablement company that ensures clinical data and quality, identified her HCC code that had not been reported since 2022, yet Innovacer/InNote does not identify any coding gaps.

Another InNote data inconsistency example is where InNote indicated a coding gap being reported on November 8, 2022, yet no claim exists with the provider identified or for the reported diagnosis on November 8. It is not until February 2023 that the diagnosis appears in InNote.

Yet another inconsistency is Innovaccer's representation that InNote "sees beyond the EMR to get a 360-degree patient view." That is not case. For example, InNote will indicate no specialty visits for patients where Fallon's testing results demonstrate that these patients had many known consults and visits.

Another InNote data discrepancy is visits and specialty visits were tested on May 16, 2023; however, the list from Innovaccer does not include the ability to validate or substantiate data and remains incomplete when compared with known visits.

Yet another data discrepancy found is suspect conditions, including a female diagnosis for a male patient, and the use of broad categories - such as taking aspirin - to indicate a vascular condition. This casts the suspect conditions into question.

These are just some examples of the deficiencies discovered through Fallon testing.

### Web-Based Risk Management Dashboard

Numerous deficiencies still plague Innovaccer's risk management dashboard. This dashboard, according to the SOW, will provide, among other things, the features discussed below.

4

For example, Innovaccer still has not delivered on its promise regarding risk recapture rates by provider organization hierarchy. Specifically, Innovaccer has not delivered on providing a dashboard that according to Innovaccer, can "go a level deeper to identify practices and providers having the best and worst risk recapture rates within an organization."

Another example of a deficiency is the dashboard is supposed to filter and prioritize chronic disease patients that have contributed most to the undocumented risk score. Unfortunately, although the filter exists, it is not user friendly. Innovaccer set the expectation that Fallon would be able to drill down to the specific member list and now Innovaccer indicates to Fallon that that is not possible.

There is also a deficiency that pertains to the filter for patients with Annual Wellness Visits (AWV) that are due. Innovaccer has provided Fallon a version of this filter that only includes the 2022 data load. Fallon knows the number of AMVs is close to 90%, yet that is not what the filter shows. In addition, Innovaccer still has not incorporated all the CPT codes used to indicate a comprehensive encounter data.

With the dashboard, Innovaccer represented that it would allow selection of the member from different risk cohorts based on risk. That function is present, but the data is inaccurate. For example, Innovaccer includes 2022 data for high-risk members showing six, but then when Fallon attempts to find the members, it does not identify any. For medium risk members, the dashboard graph identifies 491, yet the member list only identifies 60. In addition, when trying to view membership for certain categories, for some reason extra filters are applied without selection by the user. Also, there is an option to add filters, but when clicked, Fallon is prevented from proceeding to add a new filter.

The delivery of the risk management dashboard is a critical contractual obligation of Innovaccer's, yet for the reasons discussed, that dashboard still contains material deficiencies.

Fundamentally, Innovaccer has failed to perform its contractual obligations that are at the heart of what Fallon bargained for that forms the basis of Innovaccer's contractual relationship with Fallon which, in essence, is the definition of material breach prompting this notification. And per the Agreement, as discussed, Innovaccer now has 30 days to cure the material deficiencies identified in this notification.

5

Sincerely,

Mark A. Mosby
Chief Legal Counsel
508-368-9378

Cc: Todd Bailey, Stacy Coggeshall, Anthony Consolmagno, Jared Coffin at
jared.coffin@innovaccer.com; Ashok Devulapalli at ashok.devulapalli@innovaccer.com;
Alex Keltner at alex.keltner@innovaccer.com

6

# EXHIBIT D



One Chestnut Place ■ 10 Chestnut St. ■ Worcester, MA 01608 ■ 1-508-799-2100 ■ fallonhealth.org

***Sent via Email to Abhinav Shashank at*** abhinav.shashank@innovaccer.com ***and Dan Guggenheim at*** dan.guggenheim@innovaccer.com **and** ***FedEx***

September 8, 2023

Mr. Abhinav Shashank
CEO
Innovaccer, Inc.
101 Mission Street
Suite 1950
San Francisco, California 94105

Mr. Daniel Guggenheim
Chief Legal Officer
Innovaccer, Inc.
535 Mission Street
Suite 1950
San Francisco, California 94105

**Re: Fallon Community Health Plan, Inc.'s Notice of Termination to Innovaccer, Inc.**

Dear Mr. Shashank and Mr. Guggenheim:

Pursuant to Section 7.2 (a) of the Master Software as Service Agreement <u>and</u> the Service Order, together ("the Agreement"), that Innovaccer and Fallon Community Health Plan, Inc. ("Fallon") entered into on January 1, 2022, ***this letter is Fallon's formal notice to Innovaccer of Fallon's termination of the Agreement***.

Section 7.2 of the Agreement, in pertinent part, provides that the Agreement (including each individual Service Order) may be terminated by either Party "(a) if the Other Party fails to perform or observe a material term or condition in the Agreement and fails to cure such breach within thirty (30) days after receipt of written notice of such breach from the non-breaching Party."

Following Fallon's June 2, 2023 letter notifying Innovaccer of its material breach of the Agreement and despite extending beyond 30 days the time for Innovaccer to cure deficiencies expressly identified in that notice while Fallon reserved all rights under the Agreement, most deficiencies remain.

1

As such, Innovaccer has failed to perform a material term or condition in the Agreement and has been unable to cure a substantial portion of the deficiencies identified.

In fact, in a July 1, 2023 email from Mr. Guggenheim on behalf of Innovaccer to me, Innovaccer does not dispute that it failed to perform a material term of the Master Software as a Service Agreement and associated Service Order and Statement of Work. And because of its failure to perform a material term or obligation of the Agreement, Innovaccer acknowledges in that email that it needs to deliver "…a resolution for each item [Fallon] raised that would constitute a failure to perform a material term or obligation of the Agreement."

Yet, as of the date of this notice of termination, Innovaccer still has failed to deliver on most key deliverables provided for in Innovaccer's Statement of Work (SOW) included as Attachment 1 to the Service Order incorporated into the Master Software as Service Agreement that Innovaccer and Fallon entered into on January 1, 2022.

By way of example, here are just some Innovaccer deficiencies identified in Fallon's June 2, 2023 notice of material breach letter that Innovaccer is either unable or unwilling to remedy.

Data inconsistencies still persist across all of the three platforms (DAP, InNote, Patient 360). For example, what is displayed on the InNote platform and DAP dashboards often does not match the supporting data in P360. These platforms are supposed to feed off one another, with P360 as the source of data that flows into InNote and DAP.

For the InNote PACE pilot, coding and condition gaps are still identified as outstanding (last captured as of 2022) on the platforms, despite Fallon providing Innovaccer with evidence that an encounter was reported in 2023 that if Innovaccer had reported accurately, would close the gap identified in P360. Fallon discussed this InNote data inconsistency in its June 2nd letter and during the weeks that followed this notice letter, yet the gaps remain.

Despite Fallon conveying to Innovaccer on numerous occasions before and during the cure period that the data inconsistencies undermine the accuracy of platforms especially if used by providers, Innovaccer's cavalier response has been to observe that "It's just data." Innovaccer has chosen instead to make only cosmetic changes to the platform optics without addressing the persistent data inconsistencies Fallon has identified.

Also, regarding data integrity, a prospective program such as that which Innovaccer represented it could provide - not only should present conditions previously reported (recapture), but also utilize data points and logic to identify suspected conditions yet to be reported. Innovaccer only has logic to suggest 26 of the 86 HCCs and for those 26, the logic is not correct. For risk score accuracy and improvement, identifying suspect conditions is critical. Material errors in this logic undermine provider confidence, prompting providers to ignore the data presented. That renders this "prospective solution" useless.

Moreover, in Fallon's June 2, 2023 notification of material breach letter, Fallon raised concerns about data governance. And during the cure period, Fallon continued to raise those concerns. Yet still Innovaccer displays during its InNote demos specific to Fallon's PACE organization, the identity of individuals participating in a program unrelated to PACE, who are served by a provider organization no longer contracted with Fallon. As such, both coders and providers are exposed to PHI they should not be privy to, and Innovaccer remains dismissive when Fallon raises these PHI concerns. It is completely unacceptable that Innovaccer offers dashboards to providers with this kind of PHI exposure.

In addition, during the cure period, Innovaccer identified provider workflows to Fallon in various slide decks. Innovaccer, however, is unable to deliver on what it has presented for those provider workflows. For example, the InNote "solution" as Innovaccer has represented is really not a solution where the provider's ability to upload documentation to review remains completely outside the process that Innovaccer portrayed.

As discussed, Innovaccer has been unable to cure numerous deficiencies that Fallon identified and that Innovaccer acknowledges constitute a failure to perform material terms or obligations under the Agreement.

The Agreement includes the Service Order as the Service Order "is subject to and supplements the Agreement … and is expressly incorporated into and made part of the Agreement." Because the Service Order "is subject to" the Agreement, Section 7.2 of the Agreement governs termination of the "Agreement (including each Individual Service Order)."

Therefore, effective September 8, 2023, Fallon exercises its right under Section 7.2 of the Agreement to terminate the Master Software as Service Agreement and the Service Order, together ("the Agreement").

Sincerely,

Mark A. Mosby
Chief Legal Counsel

Cc: Todd Bailey, Stacy Coggeshall, Anthony Consolmagno, Jared Coffin at jared.coffin@innovaccer.com; Ashok Devulapalli at ashok.devulapalli@innovaccer.com; Alex Keltner at alex.keltner@innovaccer.com